## In Re Anonymous No. 5 D.B. 83

Disciplinary Board Docket No. 5 D.B. 83.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania

KECK, Member, May 25, 1984—Pursuant to Rule 208(d)(2) of the Pennsylvania Rules of Disciplinary Enforcement the Disciplinary Board of the Supreme Court of Pennsylvania submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

On February 9, 1983, Disciplinary Counsel filed a petition for discipline consisting of 18 paragraphs of which 17 were agreed to in essence by stipulation between Disciplinary Counsel and respondent and his counsel as follows.

"Words contained in brackets appear in the Petition for Discipline but are omitted from the stipulation. Words underlined do not appear in the Petition for Discipline but are contained in the stipulation."

1. Petitioner, whose principal office is located at [    ], Pa., is invested, pursuant to Rule 208 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all mat-

ters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

2. Respondent, [    ], Esq., was born in 1935, admitted to practice law in the Commonwealth of Pennsylvania in 1972, and his office is located at [    ].

Now, therefore, pursuant to Rule 208(b)(1) of the Pennsylvania Rules of Disciplinary Enforcement, Petitioner comes and files against respondent the following charge of alleged misconduct in violation of the Code of Professional Responsibility.

## CHARGE

3. On or about June 22, 1980, [    ] (hereinafter, [A]) was arrested by agents of the Federal Drug Enforcement Agency, on charges of conspiracy and distribution of cocaine.

4. Subsequently, respondent was contacted by [A] concerning respondent's potential representation of him.

5. On the morning of June 23, 1980, respondent met with [A] at the offices of the Drug Enforcement Agency.

(a) Respondent was accompanied to said meeting by one of his associates in the practice of law, Attorney [B].

(b) Respondent informed [A] that he would need $5,000 as an initial retainer against a total fee of approximately [$25,000.] $15,000-$20,000.

(c) [A] informed respondent at that time that there was [a substantial amount of] money "on the street" (owed to him), representing proceeds from the sale of cocaine which [A] had distributed.

162

(d) [A] then requested respondent to collect said proceeds in order that Respondent could obtain his fee therefrom.

(e) Respondent advised [A] that he would not collect the proceeds himself. Further, respondent did not indicate or imply that they would be collected at his direction.

(f) [A] then requested respondent to transmit a list of the amounts of proceeds owed, and the names of persons who owed same, from [A] to his "friend", [    ] (hereinafter [C]). [A] requested respondent to call his "friend", [C], in Florida. (The purpose of calling [C] is not stipulated to and is at issue.)

(g) [A] also provided [C]'s phone number in Florida to respondent at that time. [C] was identified only as [C] to respondent, and remained known to respondent only as [C] at all times pertinent hereto.)

6. On that same day, subsequent to the meeting with [A], respondent discussed with [B] the propriety of respondent aiding in the collection of proceeds from the sale of cocaine.

(a) [B] advised respondent that for a lawyer to aid in such collection, in any manner, would be unethical.

(b) At that time, respondent agreed with [B]'s opinion that such action by a lawyer would be unethical.

7. Subsequently, in the afternoon of June 23, 1980 respondent placed a telephone call to [C] in Florida and also had a second telephone conversation with [C] that afternoon. During the course of the telephone calls:

(a) Respondent informed [C] that [A] had been arrested; and,

(b) Respondent asked [C] to come to [    ] in order to collect the proceeds due [A] from cocaine sales.

(No stipulation.)

8. [C] arrived in [    ] on or about June 24, 1980.

9. At 11:17 p.m. on June 24, 1980 [C] telephoned respondent and informed him that he had arrived in [    ].

10. On June 25, 1980, at 11:20 a.m., [C] again telephoned respondent. The transcript of that telephone conversation is attached hereto at petitioner's Exhibit 1-A.

[(a) At that time, respondent informed [C] that he would "get a detailed list from ([A])".]

[(b) Respondent therein indicated his understanding that the anticipated list would contain details of "what is outstanding on the street", that is, names of individuals and the amounts they owed [A] on cocaine sales.]

11. In the afternoon of June 25, 1980, respondent met with [A] in the attorney's room in the [    ] County Jail. At that time:

(a) Respondent provided [A] with paper, envelopes, and a pen.

(b) Respondent provided said materials to [A] with the intention of thereby obtaining from him a list [such as described in the foregoing.] which respondent assumed, and therefore believed, would contain the information as described in petitioner's exhibit 1-A.

(c) Respondent then assumed, and therefore believed, that [A] did, in fact, then write such a list on the paper provided him by respondent.

(d) Respondent informed [A] that respondent was "doing (him) a favor", and that respondent's actions "could ultimately cause me some difficulty with the Bar Association".

(e) [A] then handed respondent an envelope.] Respondent then accepted the envelope from [A].

(f) When respondent accepted the envelope from [A], respondent then assumed, and therefore believed, it contained a list such as described in the foregoing.

(g) In fact, the envelope contained such a list.

(h) Respondent then carried said envelope out of the [      ] County Jail.

12. At the time respondent met with [A] at the [      ] County Jail, as described in the foregoing:

(a) A sign posted in the attorney's room clearly stated that it was prohibited to transfer any materials between attorney and client, without the prior approval of the warden or deputy warden.

(b) In addition, another sign posted at the entrance to the jail likewise indicated that transfer of any materials between an inmate and a visitor was expressly prohibited.

13. Respondent then further assumed and therefore believed that, if such a list were transmitted to [C], he intended to and would use the information contained in the list to collect proceeds owed to [A] from the sale of the cocaine.

14. At 4:20 p.m. on June 25, 1980 [C] telephoned respondent at his office. At that time:

(a) Respondent stated to [C], "I got an envelope for you";

(b) Respondent further stated, "I'd like to get it to you because if it's in my possession, I got some big problems. There's this billboard in the lawyer's office in there (the jail), where you go into to talk to clients about taking things in and out, giving to or taking from prisoners and what they will do to you by way of prosecution. So I got my neck sticking out a little bit right now";

(c) Respondent further stated, "Whatever he ([A]) wants you to know is written down in this envelope"; and,

(d) Respondent made arrangements for [C] to call him again once [C] found a hotel room.

15. On June 25, 1980, at 6:55 p.m. another telephone conversation took place between respondent and [C] in which respondent made plans to meet with [C] in a hotel room at the [ ] Hotel.

16. At 7:30 p.m. on June 25, 1980, respondent met with [C] at the [ ] Hotel, at which time respondent gave him the envelope containing which, respondent assumed, and therefore believed, contained the list, such as described in the foregoing, and which did, in fact, contain said list.

17. At a point in time subsequent to the above described events, respondent had occasion to testify, under oath, concerning this matter.

(a) With respect to the violation of the [ ] County Jail rules engaged in by respondent, as described in paragraphs 11 and 12 above, respondent testified that, "it dawned on me that what I was doing certainly would cause some difficulty to the Bar Association or the Disciplinary Board. . .".

(b) Respondent repeatedly testified that, although he had believed at the time that his conduct was in violation of the Code of Professional Responsibility, he was nevertheless willing to violate the Code because his fee for representing [A] would have been the largest non-contingent fee he ever would have generated, and he was "greedy" about the prospective "big fee".

Paragraph 18 of the petition for discipline charged Respondent with Violation of D.R.1-102(A)(6), A lawyer shall not . . . engage in any other conduct that adversely reflects on his fitness to practice law.

In his answer to the petition for discipline, respondent contended that D.R.1-102(A)(6) is constitutionally vague and violative of the Fifth and Four-

teenth Amendments to the Constitution of the United States and violative of the Constitution of Pennsylvania "because it is devoid of any standards which placed him on notice of the type of conduct which could result in the deprivation of his license to practice law."

A hearing was held August 25, 1983 by hearing committee [ ] consisting of [ ], [ ] having recused himself. Respondent provided the only testimony. He testified to the fact, among others, that in consequence of his association with [A] and [C] he had been indicted in the United States District Court for the [ ] District of Pennsylvania for conspiracy to distribute drugs, and that he was acquitted after a non-jury trial before Judge [D].

On October 24, 1983, the hearing committee filed its first report in which it found D.R.1-102(A)(6) to be constitutionally applicable since the Supreme Court did not strike it down in the matter of Office of Disciplinary Counsel v. John W. Campbell, Jr. 345 A2d 616-623 (1975) and the hearing committee found that respondent violated D.R.1-102(A)(6).

A continued hearing was held November 8, 1983 at which respondent testified as to his employment as law clerk in [ ] County and Disciplinary Counsel introduced copies of an informal admonition administered to respondent April 25, 1983 for violations which were not viewed as substantial of D.R.2-110 (A)(1) and 2-110(A)(2).

On December 23, 1983 the hearing committee filed its report and recommendation in which it found that respondent "is not a lawyer who undertook a course of conduct over an extended period of time which was calculated and conniving," but who committed "a sudden foolish act motivated by greed." The committee found further that "there is nothing in the record indicating that the respond-

ent has ever committed any other illegal acts as a result of greed or any other sin."

The hearing committee recommended that respondent receive public censure by the Supreme Court.

## CONCLUSION AND RECOMMENDATION

A majority of the members of the Disciplinary Board affirm the findings and recommendations of hearing committee [   ].

In consideration of the facts agreed to by·stipulation, respondent has violated D.R.1-102(A)(6) which provides that: A lawyer shall not . . . engage in any other conduct that adversely reflects in his fitness to practice law.

In consideration of the fact that, notwithstanding respondent's informal admonition, this is a single instance of misbehavior arising from an error in judgment motivated by greed, it is recommended that respondent be publicly censured by the Supreme Court.

Further it is recommended that respondent be ordered to reimburse the Disciplinary Board for the necessary expenses incurred in the investigation and processing of the petition for discipline.

## DISSENTING AND CONCURRING OPINION

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania.

ELLIOTT, *Member*, May 25, 1984— By a majority vote, this disciplinary Board of the Supreme Court of Pennsylvania found that respondent violated D.R.1-102(A)(6) of the Disciplinary Rules of the Code of Professional Responsibility which provides that: "A lawyer shall not . . . engage in any other conduct that adversely reflects on his fitness to

practice law," and recommended that respondent be publicly censured by the Supreme Court. The board's recommendation is woefully inadequate. Respondent demeaned the legal profession by actively involving it in the drug trade, a cancer which daily metastasizes into the body and soul of this Commonwealth.

I concur that respondent's conduct adversely reflects on his fitness to practice law. There can be no doubt that a lawyer who is personally involved in the collection of money generated from cocaine sales, because of his admitted "greed" for a large fee, has engaged in conduct which adversely reflects on his fitness to practice law. My dissent from the recommended discipline is joined by board member James J. Curran, Esq. At the very least, a suspension is mandated where respondent was admittedly involved in seeking a profit from the drug trade.

The legislative history to the Federal Drug Act states the obvious:

"Drug abuse in the United States is a problem of ever increasing concern, and appears to be approaching epidemic proportions. One indication of the upsurge in drug abuse in the last few years can be found in arrest statistics, although for every individual apprehended, countless others go undetected. For 1968, uniform crime reports indicate that 162,177 persons were arrested by State and local authorities for drug violations, constituting a 322 percent increase over the number of drug arrests made in 1960. Of the total number arrested in 1968, 43,200 were under the age of 18 and 6,243 were under the age of 15. Another indication of the growing seriousness of the problem is that, according to testimony presented to the committee, a leading cause of death among teenagers in the United States today in many major metropolitan areas is overdosage of heroin." 70 U.S.C.A.A.N. 4572

Respondent has admitted by stipulation to the essential facts of his personal involvement in collecting proceeds from the sale of cocaine which his client had illegally sold. Respondent admits (1) that his fee came from the money which his client told him was "on the street" from proceeds from the sale of cocaine; (2) that his jailed client told him to collect these drug sale proceeds to obtain his fee; (3) that his jailed client gave him the phone number to call a "friend" in Florida; (4) that prior to taking any further steps, respondent attorney was advised and agreed that a lawyer aiding in the collection of drug proceeds in any manner was unethical; (5) that respondent had several telephone conversations with the jailed drug dealer's "friend", who then came to [ ] to aid in the collection of these illicit funds; (6) that respondent then spoke by phone to the "friend", and offered to get a list from his client of persons owing money for cocaine buys and further admitted that it would be more difficult for the "friend" to get the list at the County Jail but he would abuse his status as a lawyer to go to the [ ] County jail to get this list; (Petitioners exhibit 1-A — Transcript of June 25, 1980 phone conversation between respondent and [C]); and (7) respondent then went to the [ ] County jail, handed his client an envelope and pen to write out the list, took it back, despite his awareness of a posted sign forbidding this, and then gave it to the "friend" to collect.

Respondent has admitted under oath that he knew his conduct violated the Code of Professional Responsibility. His defense is that he was "greedy" about the prospective big fee. Greed cannot justify an attorney's participation in the drug trade which the Pennsylvania Courts have repeatedly and properly denounced as a grave danger to society. See Commonwealth v. Funke, 306 Pa.Super. 542, 452 A.2d. 857, 853 (1982).

Respondent was not a mere innocent bystander to drug dealing. The National Institute on Drug Abuse has concluded:

". . . from the late 1950's to the late 1970's, there was a tenfold to twentyfold increase in levels of drug use among American teenagers and young adults.

. . ., drug use levels remain unacceptably high. For instance, more high school seniors reported in 1983 that most or all of their friends used marijuana than that none of their friends use the drug. Also, nearly as many high school seniors are current users of marijuana as are current smokers of cigarettes."

Respondent's jailed drug dealer client could not collect the illicit drug money, which was "on the street." Visitors to the jail could only talk on phones through glass partitions. Respondent consciously abused his position as a member of the bar of the Supreme Court of Pennsylvania to knowingly smuggle the list out of the jail.

At least a one year suspension is clearly mandated. A public censure is a mere slap on the wrist. Society cannot condone any lawyers participation in the drug trade which insidiously threatens our society and our children.

Wherefore, the undersigned member respectfully requests your honorable court not to accept the recommendation of the board relative to the imposition of discipline and to at least order the imposition of at least a one year suspension from the practice of law for respondent.

James J. Curran, Jr., Esq. joins in the Dissent.

## ORDER

NIX, *C.J.*, And now, this July 13, 1984, the recommendation of the Disciplinary Board dated May 25, 1984, is accepted, and it is ordered that respond-

ent be subjected to public censure by the Supreme Court at the session of court commencing September 10, 1984, in Pittsburgh. It is further ordered that respondent shall pay costs, if any, to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

Mr. Justice Flaherty, Mr. Justice McDermott and Mr. Justice Hutchinson dissent and would suspend for six months.